UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KEEGAN GORDON,

    Plaintiff,

v.                                                 Case No. 1:15-CV-121

TRAVERSE CITY AREA PUBLIC          HON. GORDON J. QUIST
SCHOOLS,

    Defendant.
_____/

## OPINION

Plaintiff, Keegan Gordon, was a fifteen-year-old student at Traverse City West High School when he was sexually assaulted by a teacher. Plaintiff filed a complaint against Defendant, Traverse City Area Public Schools (TCAPS) alleging: (1) a claim pursuant to 42 U.S.C. § 1983 that TCAPS's conduct in response to the assault violated Plaintiff's right to equal protection and right to be free from harassment based on sex under the Fourteenth Amendment; (2) a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* for harassment and retaliation against Plaintiff following the assault; and (3) a state-law claim that TCAPS violated the Michigan Elliott-Larsen Civil Rights Act (ELCRA), M.C.L. §§ 37.2101, *et seq.* by subjecting him to, or failing to stop, harassment and retaliation following the assault. Plaintiff's major theme is that "Defendant and the school community engaged in retaliatory treatment against Plaintiff in an apparent attempt to punish him and/or have him criminally charged, and/or to undermine his credibility during the police investigation of the charges against [the teacher] for the December 31, 2011 assault." (ECF No. 1 at PageID.4.)

TCAPS has filed a motion for summary judgment arguing that it is entitled to judgment as a matter of law. Plaintiff has filed a response, including numerous exhibits, and TCAPS has filed a reply. After fully reviewing the parties' briefs and exhibits, the Court concludes that TCAPS is entitled to summary judgment on all of Plaintiff's claims. As will be discussed more fully below, in his brief, Plaintiff mischaracterizes certain events, asserts facts unsupported by—and in some cases contrary to—the evidence he cites, and, to the extent the facts he asserts have *any* evidentiary support, they fail to show that TCAPS or anyone acting at its direction retaliated against or harassed Plaintiff because of his sex. At bottom, Plaintiff's complaint is that TCAPS and its teachers and administrators did not do enough to help him following the sexual assault, but such an allegation is insufficient to support the claims Plaintiff alleges.

## I. BACKGROUND

During the 2011–12 school year, Plaintiff was a 10th-grade student at Traverse City West Senior High School (TC West). TC West had a large student population in excess of 1,800 students, which was divided into three separate "neighborhoods" or learning groups known as Athens, Olympia, and Sparta. (ECF No. 56-3 at PageID.530.) Assistant principals assigned to each neighborhood were responsible for supervision of students within that neighborhood. During the 2011–12 school year, Joe Esper, Stephanie Long, and Charles Kolbusz were the assistant principals for Athens, Olympia, and Sparta, respectively. (*Id.* at PageID.531.) Plaintiff was assigned to the Olympia neighborhood and thus supervised by Long. (*Id.* at PageID.533.) Plaintiff was also assigned to Guidance Counselor Ashley Vanlandschoot. (ECF No. 56-7 at PageID.564.)

Plaintiff participated in sports at TC West as a member of the freshman baseball team and a member of the freshman and junior varsity football teams. (ECF Nos. 56-14 at PageID.647; 56-20 at PageID.676.) Plaintiff also had a history of disciplinary issues, including disruptive behavior and

2

a reported incident of sexual harassment of a female student. (ECF Nos. 56-1 at PageID.483–84; 56-2 at PageID.502–505; 56-11; 56-12 at PageID.616–17.) In addition, on January 4, 2012, Plaintiff was suspended for three days for chewing tobacco in the boys bathroom. (ECF Nos. 56-6 at PageID.560; 56-11 at PageID.607.)

Lisa Placek was one of Plaintiff's teachers during the latter part of this 9th grade year. Placek, who was also the girls volleyball coach, was well liked and considered "the most, like, chill teacher in the school." (ECF Nos. 56-3 at PageID.531; 57-26 at PageID.1938.) Placek also had children in school with Plaintiff at TC West at the time. At some point early in the fall of 2011, Placek began a texting relationship with Plaintiff that continued for several months. (ECF No. 57-7 at PageID.1269.) The exchanges turned sexual in nature. In December 2011, Plaintiff sent Placek a picture of his aroused penis, and Placek responded by sending Plaintiff a picture of her bare breasts. (*Id.* at PageID.1204–05; 57-10 at PageID.1480–82.) On December 31, 2011, Placek picked Plaintiff up from a friend's house and drove him to a deserted parking lot, where she performed oral sex on Plaintiff. (*Id.* at 1206–08.)

On January 19, 2012, TC West administrators learned that nude pictures of Placek were circulating among the students at the school and determined that they had originated from Plaintiff's phone. (ECF No. 57-10 at PageID.1479.) Their investigation and interviews of students also revealed that something occurred between Placek and a student on New Year Eve. (*Id.* at PageID.1481.) By the following day, January 20, school administrators believed that Placek had likely engaged in criminal sexual conduct with Plaintiff and turned the matter over to the police. (ECF No. 56-3 at PageID.531.) That same day, Placek was placed on administrative leave and removed from school property. (*Id.*) Placek resigned the following week, and, shortly thereafter, criminal charges were filed against her. (ECF No. 56-4 at PageID.544–45.)

3

School administrators and a detective from the sheriff's department met with Plaintiff and his mother, Kathy Gordon, at the end of the day on January 20 to discuss what they had learned from their investigation. (ECF No. 56-8 at PageID.570.) During the meeting or early the following week, administrators recommended to Kathy Gordon that Plaintiff stay home from school for a few days and have his school work sent home until things calmed down around the school. (ECF No. 56-3 at Page ID.532.) Kathy Gordon thought that this recommendation made sense. (ECF No. 56-2 at PageID.517–18.) On Saturday, January 21, TC West Principal Joseph Tibaldi sent an email to TC West parents addressing the allegations. The email notified the parents that the teacher had been removed pending the outcome of the criminal investigation and assured them that student safety was the "utmost priority." (ECF. No. 56-3 at PageID.531, 536.) Early the following week, Tibaldi met with the assistant principals, instructing them to ensure that Plaintiff's teachers protected him and to watch for verbal or physical harassment of Plaintiff and to report any such misconduct immediately. (*Id.* at PageID.531.) Tibaldi held a meeting with all staff members a day or two later, in which he emphasized that Plaintiff was the victim and staff should protect him, quell any rumors, be alert for inappropriate comments, and confiscate any devices containing such comments. Staff were instructed not to mention Plaintiff by name in order to protect his privacy. (*Id.* at PageID.531–32.)

On January 25, Plaintiff and Kathy Gordon met with Tibaldi and Long. In the meeting, Kathy Gordon showed Tibaldi and Long a handwritten list she made with the names of three students who had made negative comments about Plaintiff on Facebook and the names of a large number of other students who "liked" the comments. Tibaldi advised Plaintiff to stay off social media and instructed the assistant principals to speak to the three students who made the negative

4

comments.  (*Id.* at PageID.532.)  Each of the three students was reprimanded about making negative comments and told to leave Plaintiff alone.  (ECF Nos. 56-6 at PageID.560; 56-8 at PageID.580.)

On February 2, 2012, shortly after Plaintiff returned to school, the varsity baseball coach caught Plaintiff and another student chewing tobacco in a stall in the bathroom in the boys locker room.  ( ECF No. 56-14 at PageID.648.)  Although Plaintiff and the other student denied chewing tobacco, the coach claimed that he saw pieces of tobacco in both boys' mouths, and he therefore reported them to assistant principal Kolbusz.  (*Id.*)  Kolbusz suspended Plaintiff and the other student after questioning them.  (ECF No. 56-6 at PageID.561.)  On or about the same day, administrators learned that Plaintiff and other students had been viewing and showing other students pictures of a naked female student that were on the internet.  (ECF No. 56-8 at PageID.581.)  Because of the nature of the activity, the school notified the police, but no charges were filed.  (*Id.*)  However, the school suspended all of the students who had viewed or shared the pictures, including Plaintiff.  (*Id.*; *see also* ECF Nos. 56-16 at PageID.657, 56-17 at PageID.661, 57-26 at PageID.1948–49.)

Following the February 2012 tobacco incident, Kathy Gordon met with Tibaldi in order to "fight the tobacco [incident]."  (ECF No. 56-2 at PageID.516.)  Kathy Gordon insisted that Plaintiff was not a liar and was trustworthy and that, if he said he did not have or possess any tobacco, the school should believe him.  She told Tibaldi to ask Long about her opinion whether Plaintiff was honest, (*id.*), so Tibaldi did, and Long confirmed that Plaintiff had been dishonest on several occasions when he had been accused of misconduct.  (ECF No. 56-3 at Page ID.533.)  At Tibaldi's request, Long prepared a list describing those incidents.  (*Id.*; *see also* ECF Nos. 56-8 at PageID.583, 57-19 at PageID.1888.)  Plaintiff and his parents appealed the tobacco suspension.  Ultimately, the

5

school expunged the tobacco incident from Plaintiff's record because administrators "made mistakes in the investigation process." (ECF No. 57-20.)

Apparently because of the Placek incident, Plaintiff was concerned about being welcomed back to play on the baseball and football teams and requested Tibaldi to set up a meeting with the coaches. During the meeting, the coaches told Plaintiff that he was welcome to try out for and participate in the baseball and football teams but that he would have to improve his grades in order to be academically eligible. (ECF Nos. 56-3 at PageID.533, 56-14 at PageID.648, 56-20 at PageID.678.) Plaintiff decided not to try out for the baseball team, however, but went out for track instead because there were no cuts. (ECF. No. 56-1 at PageID.468.)

At the beginning of the third trimester in March 2012, the school granted Kathy Gordon's request to permit Plaintiff to take online courses from home. (ECF No. 56-7 at PageID.565.) Approximately two weeks later, Kathy Gordon notified administrators that Plaintiff wished to return to school. Guidance Counselor Vanlandschoot met with Plaintiff about Plaintiff's class schedule and suggested that Plaintiff avoid a class for which Placek's daughter was already scheduled. Vanlandschoot also recommended that Plaintiff move to a different neighborhood, which might make Plaintiff more comfortable and allow him to make a fresh start. Plaintiff agreed with both suggestions. (*Id.*)

At the beginning of the 2012–13 school year, Plaintiff's parents sent him to Arizona to attend school. Plaintiff attended Maricopa High School for approximately two months and then decided to return to school in Michigan. (ECF No. 56-1 at PageID.473.) Plaintiff enrolled in classes at TCAPS's other high school, Traverse City Central Senior High School (TC Central). Plaintiff was not harassed or bullied at TC Central. (*Id.* at PageID.480.)

On December 18, 2012, Kathy Gordon met with TCAPS Superintendent Steve Cousins and TC West Principal Tibaldi. During that meeting, Kathy Gordon complained that the school had not done enough for Plaintiff and also complained about some of the things the school had done in an effort to try to help Plaintiff, such as recommending that he stay home when news of the incident broke, recommending that he avoid classes with Placek's children, and moving him to a different neighborhood. (ECF No. 57-4 at PageID.1012–14.) In response to Kathy Gordon's inquiry about what the school could do to help Plaintiff, Cousins stated that, because of his age—16 at the time—Plaintiff needed to be involved in the conversation, as well as other professionals, including a psychologist, to assist in formulating a plan for Plaintiff. Kathy Gordon said that she would speak with Plaintiff about the offer of additional help. However, she never followed up with TCAPS. (ECF No. 57-18 at Page ID.1874–79.)[1]

Plaintiff attended TC Central until March of 2013, when he was arrested for driving under the influence of alcohol and spent 72 days in jail. (*Id.* at Page ID.482.) The following year school year, Plaintiff re-enrolled at TC West. However, he dropped out at the beginning of 2014 and has never graduated.

After the Placek incident became known to students at TC West, Plaintiff reported only three instances of face-to-face harassment to administrators: (1) a male student threw a chair at Plaintiff in the lunch room and yelled, "you better keep your mouth shut"[2]; (2) the captain of the football team made negative comments to Plaintiff; and (3) an alumnus made negative comments to

---

[1] ECF No. 57-18 is a transcript of a secret tape recording that Kathy Gordon made of the December 18, 2012 meeting. TCAPS objects to the transcript on the grounds that it is hearsay. However, only Kathy Gordon's statements are hearsay. Statements by Cousins and Tibaldi are not hearsay under Federal Rule of Evidence 801(d)(2)(A), as Cousins and Tibaldi are representatives of TCAPS. The Court may thus consider their statements. Because Plaintiff offers the evidence, the Court also considers Kathy Gordon's statements, although they are not material to the Court's summary judgment ruling.

[2] The student was apparently a friend of the female student who appeared naked in the pictures Plaintiff and the other students had been viewing and was mad at Plaintiff for his role in that activity.

Plaintiff.³  (ECF No. 56-3 at PageID.532.)  The school responded to each incident.  The student who threatened Plaintiff was suspended, (*Id.*; *see also* ECF No. 56-5), the football coach admonished the player against harassing Plaintiff or making negative comments, (ECF Nos. 56-19 at PageID.673–74; 56-20 at PageID.678), and Tibaldi told the alumnus that negative comments would not be tolerated.  (ECF Nos. 56-3 at PageID.532; 56-19 at PageID.674.)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III.  DISCUSSION

Before considering the legal bases for Plaintiff's claims, the Court first addresses Plaintiff's allegation that TCAPS retaliated against Plaintiff after learning of the Placek incident "in an apparent attempt to punish him and/or have him criminally charged, and/or to undermine his credibility during the police investigation of the charges against Placek for the December 31, 2011 assault."  (ECF no. 57 at PageID.732.)  Even a cursory review of the evidence shows that this

---

³The alumnus was the captain of the football team who also made the previous negative comment to Plaintiff.

8

allegation is entirely without merit; a detailed review of the evidentiary record shows that the allegation, and Plaintiff's description of events Plaintiff cites to support it, is based on a total misrepresentation of the factual record.

Plaintiff states that TCAPS blamed Plaintiff for the Placek incident and hatched a campaign to paint Plaintiff as a liar in order to influence the prosecutor's handling of the Placek prosecution and to persuade the school and community that, in actuality, Plaintiff was at fault for the incident. Plaintiff claims that TCAPS had Long create the so-called "Long Memo # 1" (the list that Assistant Principal Long created on February 8, 2012 at the request of Principal Tibaldi describing prior incidents of Plaintiff's dishonesty) to show that Plaintiff was a liar and that TCAPS then provided it to the prosecutor, through which it influenced the prosecutor's decision to allow Placek to plead to reduced charges. (ECF No. 57 at PageID.723 ("To prove Keegan was lying, 'Long Memo # 1' was given to Prosecuting Attorney Hubbell, who investigating [sic] the Placek case," and "Placek pleaded guilty to reduced charges, because TCAPS' character assassination of Keegan worked.").) Contrary to Plaintiff's assertion, the undisputed evidence shows that Long created "Long Memo # 1" at the request of Tibaldi, who asked Long about her opinion of Plaintiff's honesty after Kathy Gordon told him to do so. (ECF No. 56-2 at PageID.516 (Kathy Gordon stated that she told Tibaldi that Plaintiff was "'a lot of things, he's not a liar [and] [h]e is trustworthy.' . . . 'You can ask Stephanie Long . . . . my son has always been honest with her.'"); ECF No. 56-3 at PageID.533.)[4]

---

[4] In spite of Kathy Gordon's testimony, Plaintiff suggests that Tibaldi's statement in his affidavit explaining the background of "Long Memo # 1" is suspect because Tibaldi's prior deposition testimony in this case and in Plaintiff's state-court lawsuit against Placek shows that Tibaldi's account is false. Not so. In his prior testimony in the instant case, Plaintiff's counsel was questioning Tibaldi about Plaintiff's school discipline file—the file that Tibaldi reviewed before meeting with Kathy Gordon—not the memo that Long created afterwards. (ECF No. 57-15 at PageID.1712–14.) In the state-court case, Plaintiff's counsel confusingly referred to "a list of accusations against Keegan brought to a meeting" without showing Tibaldi the list to which he was referring. (ECF No. 57-16 at PageID.1816–19.) In light of counsel's vague questions, Tibaldi's uncertainty about the "list of accusations" is understandable. Neither citation undermines Tibaldi's affidavit.

Moreover, Plaintiff's assertions in his brief that TCAPS provided "Long Memo # 1" to the prosecutor and that TCAPS influenced the prosecutor's charging/plea decisions in the criminal case are pure fiction—Plaintiff offers no evidentiary support for these statements. Plaintiff's testimony that some unidentified person at the Leelanau County Sheriff's Department said something that led Plaintiff to believe that Long or TCAPS provided "Long Memo # 1" to law enforcement or the prosecutor is not only hearsay, but also speculation, and thus, not evidence.[5] (ECF. 57-7 at Page ID.1256–58.)

Plaintiff suggests that TCAPS refused to cooperate with the criminal investigation because it tried to cover up a 2008 incident in which Placek sent a former student nude pictures of herself and had sex with the student. However, Athletic Director Patti Tibaldi, who received the email from the former student's girlfriend, was concerned about disclosing the email because of Patti Tibaldi's relationship with the former student-athlete, not because she was trying to protect Placek. (ECF No. 58-1 at PageID.2297.) Moreover, it is undisputed that TCAPS had no knowledge of the prior event until after the Placek incident and, in any event, unlike the incident involving Plaintiff, Placek's interaction with the former student occurred after he had already graduated from high school.[6]

Plaintiff's claims that TCAPS suspended him from school on the day the Placek incident became known, banned him from classes with Placek's children, and reassigned him to a new neighborhood as punishment for the Placek incident also mischaracterize the facts. When news of

---

[5]Plaintiff also refers to "Long Memo # 2"—an October 25, 2012 memo from Assistant Principals Kolbusz, Long, and Esper to Principal Tibaldi providing "a chronological summary of teacher/counselor/administrator involvement in matters related to Keegan Gordon." (ECF No. 57-30.) At the time "Long Memo # 2" was created, Placek had been sentenced, Plaintiff was in the midst of suing Placek in state court, and Placek's counsel was threatening suit against TCAPS. (ECF No. 57-16 at PageID.1815) ("I have bent over backwards not to sue this school and you've invited me at every opportunity to do so. Okay? If I ever sue the school it's going to be because of your invitation, I'll just tell you that."). In light of these events, the creation of "Long Memo # 2" is unremarkable.

[6]Plaintiff offers no evidence that TCAPS did not provide the email to law enforcement or that the prior incident was never disclosed to law enforcement.

10

the Placek incident broke, school administrators sensibly advised Plaintiff to stay home for a few days and have his homework sent home, in order to allow things to settle down at school. Kathy Gordon agreed with this suggestion. In addition, TCAPS administrators recognized that Placek's own children, as well as Plaintiff, were victims of their mother's acts and sought to protect them all by keeping them apart. Had Placek's children requested a class several weeks into the trimester in which Plaintiff was already enrolled, TCAPS would have likely made the same recommendation—that they not attend the same class as Plaintiff. Finally, moving Plaintiff into a different neighborhood where he was not as well known was intended to allow Plaintiff to make a fresh start and avoid negative attention as a result of the incident. Plaintiff did not disagree with any of these decisions.[7]

Plaintiff also claims that TCAPS falsely accused him of chewing tobacco and reported him to the police for such activity. First, although Plaintiff maintained and continues to maintain that he was not chewing tobacco and did not possess tobacco in the February 2012 incident, TCAPS has presented evidence showing that it had a substantial basis to believe Plaintiff was either chewing or possessed tobacco. It suspended Plaintiff and the other student involved because the baseball coach said that he saw Plaintiff with tobacco. TCAPS was not obligated to accept Plaintiff's version of events, especially in light of the fact that Plaintiff had been suspended approximately one month earlier for chewing tobacco. TCAPS also did not report Plaintiff to the police for chewing tobacco, as Plaintiff states in his brief. Rather, the police report Plaintiff cites states that the officer was called to the school for "obscenities/possible child sexually abusive material," and at some point Assistant Principal Kolbusz mentioned that Plaintiff had also been found in possession of tobacco,

---

[7]Ironically, Plaintiff contends that moving him to a different neighborhood was a retaliatory act because he no longer had his "social and support group within the school," but had Plaintiff remained in the Olympia neighborhood, he would have been supervised by Long, who Plaintiff describes as his "chief antagonist." (ECF No. 57 at Page ID.723, 727.)

for which he was to be separately suspended. (ECF No. 57-22 at PageID.1894, 1896.) Finally, Plaintiff's assertion that TCAPS expunged the tobacco suspension because it was false is simply wrong. The suspension was expunged on a procedural ground. As for Plaintiff's assertion that TCAPS falsely accused him of viewing and showing other students naked online pictures of a TC West female student, Plaintiff incorrectly states that the police found the allegation untrue. Rather, the police report Plaintiff cites states only that the investigating officer was unable to access the pictures using the search Plaintiff described. (ECF No. 57-22 at PageID.1895–96.) TCAPS has provided affidavits from other students who were suspended, as well as from the female depicted in the pictures, all of whom confirm that Plaintiff and others viewed the pictures. TCAPS had ample proof that Plaintiff engaged in viewing the pictures.

Regarding online harassment/bullying by other students, Plaintiff testified that he complained to school officials 4 to 10 times, but he could not recall to whom he made such complaints. (ECF 57-7 at PageID.1233-34.) However, as indicated above, TCAPS administrators responded to Kathy Gordon's complaints about the three online comments by students.[8] In addition, administrators responded to the only known incidents of face-to-face harassment.[9]

Plaintiff also claims that the baseball and football coaches "shunned" him following the Placek incident, but as indicated above, both coaches met with Plaintiff at Plaintiff's request and

---

[8] In the December 18, 2012 meeting that Kathy Gordon had with Cousins and Tibaldi, Kathy Gordon mentioned bullying and taunting but did not provide any specifics. Her complaint was that TCAPS was not doing enough to help Plaintiff.

[9] Plaintiff also refers to a hate website showing Plaintiff's pictures, but there is no evidence showing that Plaintiff made school officials aware of the website, nor is there any indication that TCAPS had any control over the website. Plaintiff also cites an unauthenticated handwritten note dated February 1, 2012. Plaintiff states that the note says that "hundreds" of students were chanting "show me the picture" at a basketball game between TC West and TC Central on January 21, 2012—one day after the Placek incident became known. (ECF No. 57-13.) The document is apparently hearsay, but in any event does not indicate that "hundreds" of students were involved. Moreover, it does not show that administrators were aware of the conduct or that students were never reprimanded. More importantly, Plaintiff does not even claim he was present at the game and heard the chant or that he was even aware of it prior to filing this lawsuit.

confirmed that he was free to try out for and participate on the teams, provided that Plaintiff could sufficiently improve his grades. Moreover, Plaintiff's own witness testified that the football coaches were friendly to Plaintiff and "were just there for him, supported him." (ECF No. 57.26 at PageID.1955.)

Finally, Plaintiff generally asserts that TCAPS and its administrators refused to help him academically or to make special accommodations for Plaintiff in light of the disruption the Placek incident caused to his academic progress. The undisputed evidence shows otherwise. For instance, TCAPS allowed Plaintiff to drop theater because he was uncomfortable performing in front of other students, made arrangements for teachers to meet with him during preparation time to help him catch up on assignments, sent assignments home with his sister when he was not attending school, granted his request to take online courses at the beginning of the third semester, arranged for him to take certain classes on a credit/no credit basis, and allowed him to work independently in a focus rooms when he became anxious in the regular classroom. (ECF No. 56-7.) Moreover, Superintendent Cousins offered to develop, with Plaintiff's participation, a plan to ensure Plaintiff's academic success going forward, but Kathy Gordon never followed up on the offer.

**A.     Title IX and ELCRA Claims**

The challenge that confronts the Court in analyzing Plaintiff's legal claims is determining exactly what claim or claims Plaintiff alleges, because Plaintiff melds distinct legal claims into a single claim. For example, in Count II—captioned Gender Discrimination under Title IX—Plaintiff alleges that he was harassed through retaliation as a result of the Placek incident. (ECF No. 1 at PageID.7–8.) In his brief, Plaintiff clarifies that his claim is not based on Placek's sexual assault, but instead "rests on the fact that TCAPS *committed and tolerated* many, many retaliatory acts" against Plaintiff because of the Placek incident. (ECF no. 57 at PageID.732.) However, Plaintiff

cites Title IX cases concerning teacher-on-student and student-on-student sexual harassment, rather than retaliation, but later in his brief states that all of his claims "are based primarily on evidence of retaliation." (*Id.* at PageID.740.) In Count III, denominated a claim under ELCRA for sex harassment, Plaintiff alleges that TCAPS "[s]ubjected Plaintiff, because of his complaint of female teach-on-student sexual assault, to conduct and communication which had the purpose and/or effect of denying him the full benefit of the educational program of Defendant TCAPS and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity" and by allowing or failing to prevent harassment and retaliation by teachers and others under TCAPS's control (*Id.* at Page ID.9.) In his brief, Plaintiff confirms that his ELCRA claim is based on retaliation, although he quotes a case discussing a hostile environment claim under Title IX. In light of the foregoing, the Court will assume that Plaintiff asserts retaliation and hostile environment claims under both Title IX and ELCRA.

1. **Retaliation**[10]

Plaintiff has no direct evidence of retaliation. Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful [retaliation] was at least a motivating factor in the [defendant's] actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). None of the evidence cited above qualifies as direct evidence, nor does Plaintiff claim he has such evidence. Plaintiff is thus left to establish his retaliation claim by circumstantial evidence through the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981). Under this framework, a plaintiff may establish a prima facie case of

---

[10]Retaliation claims under Title IX and ELCRA are analyzed under the same legal framework as Title VII claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013). Accordingly, the Court employs a single analysis for both claims.

retaliation by showing that: (1) he engaged in protected activity; (2) the defendant had knowledge of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013); *see also Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 851 (E.D. Mich. 2012) (quoting *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91–92 (2d Cir. 2011)). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Fuhr*, 710 F.3d at 674–75. Once the defendant has done so, the burden of production shifts back to the plaintiff to demonstrate that the articulated reasons were a mere pretext for discrimination. *Id.* at 675.

Plaintiff's retaliation claim has no merit. First, it fails at the first step of the prima facie case. Plaintiff presents no evidence, nor does he argue, that he engaged in protected activity. TCAPS learned of Plaintiff's involvement in the Placek incident not through Plaintiff's or his parent's complaint, but through student rumors and its own investigation which culminated in TCAPS turning the matter over to the police and contacting Plaintiff's parents. Although Kathy Gordon complained to the school on a few occasions about online student harassment, Plaintiff's tobacco-related suspension, and TCAPS's lack of educational support for Plaintiff, Plaintiff does not allege any retaliation because of such complaints. Rather, Plaintiff's claim is that he suffered retaliation because TCAPS blames him for the Placek incident. (ECF No. 57 at PageID.724.) Engaging in a sex act with a teacher, of course, is not protected conduct.

Second, even if Plaintiff could show that he engaged in protected activity, the only possible adverse actions that TCAPS took against him were suspending him for chewing tobacco and viewing pictures of a naked female student. As set forth above, TCAPS has presented evidence, which Plaintiff has failed to rebut, that it had "a good faith belief, formulated through a reasonable

15

reliance on particularized facts, for [its decisions to suspend Plaintiff]." *Williams v. Columbus Metro. Hous. Auth.*, 90 F. App'x 870, 875 (6th Cir. 2004) (citing *Smith v. Chrysler Corp.*, 155 F. 3d 799, 807 (6th Cir. 1998)).  In addition, Plaintiff's allegation that TCAPS sought to paint him as a liar to undermine the Placek criminal prosecution is simply untrue, as are many of Plaintiff's other allegations.  Similarly, Plaintiff's allegation that TCAPS ignored harassment and bullying by other students lacks any evidentiary support.  In fact, the evidence shows otherwise.  Finally, TCAPS's recommendations to Plaintiff that he stay home until the atmosphere calmed down, change neighborhoods to make a new start, and avoid classes with Placek's children do not constitute adverse actions.

**2.    Sexual Harassment**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance. . . ."  20 U.S.C. § 1681.  Similarly, ELCRA prohibits educational institutions, including a public school, from "[d]iscriminating against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of . . . sex."  M.C.L. § 37.402(a).

To establish a prima facie case of sexual harassment, a plaintiff must show that:

(1)    the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provide by the school,

(2)    the funding recipient had actual knowledge of the sexual harassment, and

(3)    the funding recipient was deliberately indifferent to the harassment.

*Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444–45 (6th Cir. 2009) (citing *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 258–59 (6th Cir. 2000)).

The Court need not analyze any of these elements, however, because Plaintiff's claim fails for the basic reason that Plaintiff does not allege that he was harassed because of his sex. "Title IX was not intended and does not function to protect students from bullying generally (as opposed to sexual harassment or gender discrimination) or to provide them recourse for mistreatment that is not based on sex." *Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.*, No. 3:06cv1947(PCD), 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009). In *Sanches v. Carrollton-Farmers Branch Independent School District*, 647 F.3d 156 (5th Cir. 2011), the Fifth Circuit found that the alleged student harasser's conduct of calling the plaintiff a "ho", discussing a rash on the plaintiff's breast and starting a rumor that the plaintiff had a hickey on her breast, and starting a rumor that the plaintiff was pregnant were not based on the plaintiff's sex, but instead were in response to a personal squabble between the plaintiff and the harasser. The court found the alleged conduct to be "more properly described as teasing or bullying than as sexual harassment." *Id.* at 165–66. In *Brodsky*, the court observed that the alleged harassment "was triggered by a particular incident between the girls rather than by a general hostility on the part of [the alleged harasser] toward other female students based on their gender." 2009 WL 230708, at *7. In the instant case, there is no evidence that the alleged acts of harassment occurred on the basis of Plaintiff's sex. Rather, as Plaintiff readily admits in his brief, his allegation is that he was harassed because of his involvement in the Placek incident. (ECF No. 57 at PageID.731 ("The facts seem clear: After the teacher sexually assaulted Keegan, the school system persecuted him for the crime.").) In fact, in paragraph 28 of his complaint, Plaintiff alleges that the "sexual assault result[ed] in harassment *because of his student status*," (ECF No. at PageID.7), not because of his sex. Consequently, Plaintiff's claims that he was subjected to a hostile environment because of his sex lack merit

**B.  Sex Harassment/Equal Protection**

In Count I of his complaint, Plaintiff alleges a claim under 42 U.S.C. § 1983 for sex harassment and violation of his right to equal protection.  For the reasons set forth above, Plaintiff has no evidence that he was subjected to harassment because of his sex.  Plaintiff alleges that he was harassed because of the Placek incident.  With regard to his equal protection claim, Plaintiff must show that TCAPS treated him disparately as compared to similarly situated individuals and that such treatment either burdened a fundamental right, targeted a suspect class, or has no rational basis.  *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).  Other than addressing the issue of a policy or custom for municipal liability, Plaintiff fails to develop his equal protection claim with evidence or argument that he was treated differently compared to similarly situated individuals.  Accordingly, this claim is waived.  *See Slater v. Potter*, 28 F. App'x 512, 513 (6th Cir. 2002) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

### IV.  CONCLUSION

For the foregoing reasons, the Court will grant TCAPS's motion for summary judgment on all of Plaintiff's claims.

An Order consistent with this Opinion will enter.


Dated:  April 19, 2016                                 /s/ Gordon J. Quist
                                                               GORDON J. QUIST
                                           UNITED STATES DISTRICT JUDGE